HELANE L. MORRISON (State Bar No. 127752)
JAMES A. HOWELL (State Bar No. 92721)
JUDITH L. ANDERSON (State Bar No. 124281)
MICHAEL S. DICKE (State Bar No. 158187)
ROBERT LEACH (State Bar No. 196191)

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 1100
San Francisco, California 94104
Telephone:  (415) 705-2500

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Civil Action No. |
| Plaintiff, | |
| vs. | COMPLAINT |
| CHARLES W. McCALL, | |
| Defendant. | |

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

**SUMMARY OF THE ACTION**

1.      From at least January 1998 through April 1999, Charles W. McCall, former Chairman of the Board of Directors of McKesson HBOC, Inc., participated in a fraudulent scheme with other top executives to inflate revenue and net income at McKesson HBOC and at a company it acquired.  McKesson HBOC is a Fortune 100 company with its corporate headquarters in San Francisco. At the relevant time, McKesson HBOC was the world's largest wholesale pharmaceutical supplier.

2.      McCall began the fraudulent scheme no later than January 1998, when he was Chief Executive Officer and Chairman of the Board of Atlanta-based HBO & Co. ("HBOC"), before

COMPLAINT
SEC v. McCall

that healthcare software company was acquired in January 1999 by McKesson Corporation to form McKesson HBOC. After the acquisition, McCall's participation in the fraud continued.

3.      McCall and other top managers created the false impression that HBOC, and later the HBOC division of McKesson HBOC, had a continuous run of financial success and repeatedly exceeded analysts' expectations. In fact, HBOC's and McKesson HBOC's reported financial results for 1998 and early 1999 were substantially overstated. When, in April 1999, McKesson HBOC announced that it had discovered accounting irregularities, the price of McKesson HBOC's common stock tumbled from approximately $65 to $34 a share, a loss to the company's shareholders of $9 billion in market value of their shares.

4.      At HBOC, during each quarter of 1998, McCall directed top managers to report incomplete sales as revenue. In many cases the sales were incomplete because the sales contract was not finalized until after the end of the quarter and then backdated to hide that fact. Other incomplete sales were contingent on future events. In addition, McCall authorized HBOC's chief financial officer to make false entries in HBOC's accounting records for the purpose of reducing expenses and inflating HBOC's reported net income. After the acquisition, in order to meet analyst expectations for the quarter ended March 31, 1999, McCall participated in a fraudulent $20 million sale that was negotiated and finalized after the quarter ended, yet included as revenue for the earlier quarter.

5.      As a result of McCall's conduct, the financial statements and other reports of McKesson HBOC and HBOC were materially false and misleading from at least January 1998 through April 1999. On July 14, 1999, McKesson HBOC restated its combined financial results, acknowledging that the originally announced results were substantially overstated. McKesson HBOC's restatement is summarized in Appendix 1 to this complaint, and is incorporated by this reference.

6.      The Commission seeks to enjoin defendant McCall from future violations of the federal securities laws and from serving as a director or officer of companies reporting to the Commission, and to obtain disgorgement of all benefits received by McCall from his violations of the securities laws and civil money penalties for the violations.

**JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT**

7.      The Commission brings this action pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], and Sections 21(d), 21(e), and 21A of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78u-1(a)].  This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(e) and 78aa].

8.      McCall, directly or indirectly, made use of the means and instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, in connection with the acts, practices, and courses of business and transactions alleged herein.

9.      This district is an appropriate venue for this action under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Certain of the transactions, acts, practices and courses of business constituting the violations alleged herein occurred within the Northern District of California.

10.     Assignment to the San Francisco Division is appropriate pursuant to Civil Local Rules 3-2(c) and 3-2(d) because a substantial part of the events that give rise to the claims herein occurred in San Francisco County, California.

**THE DEFENDANT**

11.     **Charles W. McCall,** age 59, is, upon information and belief, a resident of Fort Lauderdale, Florida.  He served as Chief Executive Officer of HBOC at all times relevant herein until HBOC's acquisition by McKesson Corporation on January 12, 1999.  He also served as Chairman of HBOC from January 1998 until the acquisition, and thereafter served as Chairman of McKesson HBOC until he was removed as Chairman on June 21, 1999.

**THE COMPANIES**

12.     **HBO & Company** was a corporation organized under Delaware law with its principal place of business in Atlanta, Georgia.  HBOC developed, marketed and sold computer software for patient care and other management data for the health care industry.  At all times relevant to this action, HBOC common stock was traded on the NASDAQ National Market System.

13.     **McKesson HBOC, Inc**. is a corporation organized under Delaware law with its principal place of business in San Francisco, California.  Prior to its acquisition of HBOC on January 12, 1999, McKesson HBOC was known as McKesson Corporation.  The company was primarily engaged in the manufacture and distribution of health care supplies, pharmaceuticals and drinking water.  Following the acquisition, the computer software business of the former HBOC became a wholly-owned subsidiary of McKesson HBOC.  McKesson HBOC and its subsidiaries report their financial results to the Commission on a consolidated basis.  At all times relevant to this action, the common stock of McKesson HBOC was traded on the New York Stock Exchange and Pacific Stock Exchange.  On July 25, 2001, McKesson HBOC changed its name back to McKesson Corporation.  For purposes of this complaint, however, the company will be referred to as "McKesson HBOC."

## ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

### A.    McCall Was A Control Person of HBOC And McKesson HBOC.

14.     As CEO of HBOC, McCall had overall responsibility for the day-to-day operations of the company and accurate reporting of the company's operations to its board of directors, the Commission and the public.  As a director of HBOC, and later of McKesson HBOC, McCall had the responsibility, along with the other directors, to set policies and goals for the company and oversee the management of the company on behalf of its shareholders.

15.     In order to sell their common stock and other securities to members of the public and to maintain public trading of their securities, HBOC and McKesson HBOC were required to comply with statutes and regulations designed to ensure that their financial information was accurately recorded and disclosed to the investing public.  Under these statutes and regulations, HBOC and McKesson HBOC had a duty to, among other things:  (a) make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflected their transactions and dispositions of assets; (b) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles ("GAAP") and to

maintain accountability for assets; (c) file with the Commission an annual report on the appropriate form (known as a "Form 10-K") for each fiscal year including a financial statement with a balance sheet and statements of income and cash flows prepared in conformity with GAAP and certified by an independent public accountant; and (d) file with the Commission quarterly reports on the appropriate form (known as a "Form 10-Q") for each of the first three quarters of each fiscal year including financial statements that disclosed their financial conditions and results of business operations for each three-month period.

16.    At all times relevant herein until January 12, 1999, as CEO and Chairman of HBOC, McCall possessed the power to direct HBOC to engage in improper revenue recognition practices and routinely exercised this power.  McCall established quarterly earnings and revenue targets, pressured HBOC's staff to meet these targets and met regularly with senior managers to monitor each quarter's results.  McCall also directed and permitted a range of improper accounting practices, including concealment of separate writings containing contract contingencies known as "side letters" and of backdated contracts from HBOC's accounting department.  McCall's actions caused HBOC to inflate earnings in violation of GAAP so that the company could meet analyst expectations.  McCall knew of the improper accounting practices or was reckless in ignoring red flags that should have led him to investigate.  Instead, McCall took no meaningful action to investigate or prohibit the improper accounting practices or to prevent HBOC from disclosing artificially inflated financial results during the period.

17.    In March, October and November 1998, McCall signed management representation letters to HBOC's auditor as described in this Complaint, in which he falsely stated that there were no material events that HBOC needed to disclose.  McCall also signed Forms S-4 and S-4/A filed with the Commission, as described in this Complaint, and reviewed HBOC's quarterly filings with the Commission during 1998, including the misstated filings described in this Complaint. In addition, McCall approved all HBOC quarterly earnings press releases for the period and regularly communicated on behalf of the company with Wall Street analysts.

**B.    Defendant Agreed Upon And Carried Out A Fraudulent Scheme To Misrepresent HBOC's Financial Condition In 1998.**

18.    During a period from at least January 1995 through January 1998, HBOC's senior management approved and issued a series of quarterly announcements of revenue and earnings per share of common stock.  Except for the first quarters of 1996 and 1997, the announced revenue from product sales in each quarter was higher than the previous quarter.  HBOC's stock price rose steadily throughout the period from January 1995 through January 1998, except for a period of decline during the first quarter of 1997.

19.    During the period from January 1995 through January 1998, most stock analysts who reported on HBOC predicted an unbroken series of increases in revenue from product sales.  In press releases and public filings, HBOC consistently announced results that met or exceeded analysts' predictions in all quarters except the first quarters of 1996 and 1997.

20.    Beginning not later than the quarter ended March 31, 1998, McCall knew or was reckless in not knowing that HBOC managers were using improper accounting practices to artificially inflate revenue, including recognition of revenue from contracts with unsatisfied contingencies, and backdating of contracts and other documents for the purpose of recognizing revenue in an earlier reporting period.  McCall established quarterly internal earnings per share and revenue targets for HBOC.  During each quarter of 1998, McCall monitored HBOC's efforts to meet the targets he had set, meeting regularly with senior managers to project the quarter's results.  McCall and other HBOC managers followed the progress of software sales generally and assessed the likelihood that particular sales would close within the quarter, tracking sales closely in the last days of the quarter.  As a result, McCall and other managers were keenly aware of the amount of sales the company was likely to report in each quarter and how the sales would compare to the predictions of analysts.

21.    During the quarter ended March 31, 1998, McCall became aware that HBOC's product sales were unlikely to meet analysts' predictions for revenue or earnings in that quarter.  In March 1998, McCall and several other top managers, including Jay Gilbertson, HBOC's then Co-President, Co-Chief Operating Officer and Chief Financial Officer; Albert Bergonzi, HBOC's then

Co-President and Co-Chief Operating Officer; and Jay Lapine, HBOC's then General Counsel, agreed, either explicitly or by conduct, to misrepresent HBOC's financial condition.  In a meeting that month, McCall and other top managers devised a scheme (1) to recognize revenue on a wide range of sales contracts, including contracts with contingencies and contracts concluded after quarter-end contrary to GAAP, (2) to boost earnings by manipulating HBOC's accounting books and records, including misuse of reserves established for acquisition related expenses, contrary to GAAP, and (3) to hide contract contingencies and other irregularities from HBOC's accounting department and auditors.  By this means, McCall and other top managers inflated the company's reported revenue and reduced reported operating expenses and net income on its financial statements for the quarter ended March 31, 1998.  The scheme continued in the quarters ended June 30, 1998, September 30, 1998, December 31, 1998 and after HBOC's acquisition by McKesson through the quarter ended March 31, 1999.

22.     To increase the reported sales in each quarter of 1998, HBOC managers, using the methods agreed upon by McCall, negotiated, executed or approved product sale transactions in which the sale was contingent upon future events or actions by the buyer.  HBOC employees excluded these contingencies from the terms contained in the company's formal sales contracts and instead provided for the contingencies in side letters.  Generally, only the formal sales contracts were forwarded to the HBOC employees who entered sales and revenue information in the company's accounting books and records.  Side letters were withheld from those accounting department employees.  McCall and the other top managers knew, or were reckless in not knowing, that the failure to report all of the terms of the transactions to the accounting staff resulted in improper recording of sales in the company's accounting books and records and improper recognition of revenue on sales that did not conform with GAAP.

23.     Throughout 1998, also using the methods agreed upon by McCall, HBOC managers executed or approved sales contracts in which the contract document was backdated to make it appear that the transaction had occurred in a prior quarter.  McCall and the other managers knew, or were reckless in not knowing, that the backdating of contract documents was not reported to the accounting staff responsible for revenue recognition.  McCall and the other managers also knew,

or were reckless in not knowing, that the backdating of transaction documents to a prior quarter resulted in the improper recording of sales and the overstatement of revenue for the quarter.

24.     Additionally in furtherance of the scheme devised by McCall and other HBOC managers, evidence of side letters was hidden or destroyed.  During the first quarter of 1998, HBOC's contract administration employees were directed to separate any side letters from the corresponding sales contracts and forward the sales contracts to the accounting staff.  The side letters were delivered to Dominick DeRosa, HBOC's Senior Vice President of Enterprise Sales.  Thereafter, and continuing through September 1998, DeRosa obtained additional side letters for sales transactions from contract administration employees.  DeRosa kept these side letters in a desk drawer in his office.  This practice was designed to conceal the side letters from the company's accounting staff.  As the number of side letters and contingent sales grew, DeRosa directed an employee reporting to him to create and distribute to the sales staff a list of the company's contingent sales.  The employee did so.  DeRosa did not give the list to the company's accounting staff.  After DeRosa left the company in mid-October 1998, his successor took over DeRosa's practice of maintaining the lists of contingencies and  side letters, knowing that this information was being withheld from the accounting staff responsible for revenue recognition.

25.     While engaging in the conduct described above, McCall and other members of HBOC top management knew, but chose to ignore, the company's internal revenue recognition policy which made it improper to recognize revenue on contingent, backdated and late shipped sales. The company's internal revenue recognition policy required, among other things, that product sales would be recognized in the company's books only if the sales were completely documented, all deliverable products had been shipped, and the contracts were not subject to any contingency. McCall also knew or was reckless in not knowing that recognizing revenue on contingent, backdated and late shipped sales would cause the company's accounting records and reports not to conform with GAAP.

26.     Acting at McCall's direction, and under his control, HBOC employees engaged in the conduct described below.

**C.**   **Misrepresentations Concerning The Quarter Ended March 31, 1998.**

27.     In its Form 10-K filed on July 14, 1999, McKesson HBOC restated the results for the period ended March 31, 1998.  HBOC originally reported revenue of $342.8 million and net income of $64.9 million for the period.  In its restatement, McKesson HBOC reported that revenue for this period had been overstated by $16.3 million, or 4.3 percent, as a result of improper accounting practices.   McKesson HBOC also reported that net income for the period had been overstated by $19.3 million, or 42 percent, due to improper accounting practices.  Revenue from backdated contracts and contracts with side letter contingencies accounted for $7.3 million for the quarter or a 2.2 percent overstatement of revenue, and a 7.8 percent overstatement of originally reported software revenue of $101.2 million.

28.     In the first quarter of 1998, McCall knew or was reckless in not knowing that HBOC recognized revenue improperly on product sales transactions that were subject to unresolved contingencies by the end of the quarter.  HBOC sales employees, acting in accordance with the scheme devised by McCall and other senior managers, withheld information concerning these contingencies from the company's accounting staff responsible for revenue recognition.  As a result, the company's overstated revenue for the quarter included approximately $5,332,308 from the following transactions:

a.     HBOC sold product to Covenant Health pursuant to a contract dated March 31, 1998, with a side letter dated April 1, 1998 that made the sale subject to approval by the buyer's administration and board of directors.  HBOC recognized revenue from the sale in the total amount of $1,106,000 in the quarter ended March 31, 1998.

b.     HBOC sold product to Aspen Medical Group subject to a side letter dated March 28, 1998.  The side letter made the sale contingent upon approval by the buyer's board of directors.  HBOC recognized revenue from the sale in the amount of $1,527,582 in the quarter ended March 31, 1998.

c.     HBOC sold product to St. Mary's Health System, Inc. in Knoxville, Tennessee subject to a side letter making the sale contingent upon approval by the buyer's board of

directors.  HBOC recognized revenue from the sale in the amount of $507,732 in the quarter ended March 31, 1998.

d.  HBOC sold product to Swedish Health Services in Seattle, Washington, subject to a side letter dated March 31, 1998 making the sale contingent upon final negotiation of certain contract terms.  HBOC recognized revenue from the sale in the amount of $1,959,294 in the quarter ended March 31, 1998.

e.  HBOC sold product to Capital Region Healthcare of Concord, New Hampshire, subject to a side letter dated March 30, 1998 making the sale contingent upon approval by the buyer's board of directors.   HBOC recognized revenue from the sale in the amount of $231,700 in the quarter ended March 31, 1998.

29.  In March 1998, McCall and other top managers agreed to manipulate HBOC's accounting books and records to reduce expenses and inflate earnings.  Among other things, McCall proposed that HBOC improperly use reserves and accruals to boost reported earnings per share by 50 to 75 cents if needed.  McCall knew or was reckless in not knowing that these methods violated GAAP.  McCall also knew or was reckless in not knowing that, in accordance with his proposal, HBOC employees booked certain other operating expenses incurred during the quarter as charges against reserves set aside in prior quarters for expenses related to HBOC's acquisition of other companies during 1997.  The accounting entries were inconsistent with GAAP and had the effect of artificially increasing HBOC's income as shown on its financial statements for the quarter.

30.  On April 14, 1998, HBOC publicly announced in writing the company's preliminary operating results for the period ended March 31, 1998.  The announcement quoted McCall as stating that "HBOC had a strong software sales quarter, built the software sales pipeline to almost $1.7 billion and continued to increase services revenue as a percentage of total revenue."  The announcement further stated that the company had software sales revenue of $101.2 million, total revenue of $342.8 million, total operating expenses of $239.8 million, and net income of $64.9 million in the quarter.  These amounts included the improperly recognized revenue and the understated expenses described above.

31.     On May 11, 1998, HBOC filed with the Commission a report on Form 10-Q for the period ended March 31, 1998.  In the financial statements included in HBOC's Form 10-Q, the company reported total revenue of $342.8 million, total operating expenses of $239.8 million and net income of $64.9 million for the period.  These reported results included the improperly recognized revenue and the understated expenses described above.

32.     McCall was aware of HBOC's April 14, 1998, public announcement and the company's May 11, 1998 quarterly report at the time they were issued.  He knew, or was reckless in not knowing, that the announcement and the report were materially false and misleading when issued.

**D.     Misrepresentations Concerning The Quarter Ended June 30, 1998.**

33.     In its Form 10-K filed on July 14, 1999, McKesson HBOC restated the results for the period ended June 30, 1998.  HBOC originally reported revenue of $376.7 million and net income of $75.6 million for the period.  In its restatement, McKesson HBOC reported that revenue for the period had been overstated by $68.6 million, or 22.3 percent, as a result of improper accounting practices.   McKesson HBOC also reported that net income for the period had been overstated by $52.1 million, or 221.7 percent, due to the improper accounting practices.  Revenue from backdated contracts and contracts with side letter contingencies accounted for $37.3 million for the quarter or a 10.8 percent overstatement of revenue, and a 40 percent overstatement of originally reported software revenue of $130.4 million.

34.     At the close of the second quarter of 1998, defendant McCall caused HBOC to recognize revenue improperly on sales transactions that were subject to unresolved contingencies at that date.  HBOC sales employees, acting in accordance with the scheme McCall devised, withheld information concerning these contingencies from the company's accounting staff responsible for revenue recognition.   The company's overstated revenue for the quarter included approximately $16.3 million from the following transactions:

a.     HBOC sold product to UPMC Health System on a contract still being negotiated after June 30, 1998 and subject to a side letter dated June 25, 1998.  The side letter gave

the buyer 30 days to cancel the sale.  The buyer's right to cancel was subsequently extended through October 1998.  HBOC recognized revenue from the sale in the amount of $6.99 million in the quarter ended June 30, 1998.

b.      HBOC sold product to Kaiser-Perot on a contract backdated to June 30, 1998 and subject to a side letter dated July 6, 1998 making the sale contingent on board approval. HBOC recognized revenue from the sale in the amount of $2.8 million in the quarter ended June 30, 1998.

c.      HBOC sold product to Healthcare Imaging Services on a contract dated June 29, 1998 subject to a side letter contingency dated June 28, 1998 allowing for continuing negotiations.  HBOC recognized revenue from the sale in the amount of $1.9 million in the quarter ended June 30, 1998.

d.      HBOC sold product to Sisters of Charity on a contract still being negotiated on June 30, 1998, and subject to a side letter dated June 19, 1998.  The side letter made the sale subject to cancellation by the buyer until December 24, 1998.  A second side letter dated December 18, 1998, extended the buyer's right of cancellation to April 9, 1999.  HBOC recognized revenue on the sale in the amount of $1.25 million in the quarter ended June 30, 1998.

e.      HBOC sold product to Holy Cross Hospital on a contract dated June 30, 1998, subject to a side letter dated June 30, 1998.  The side letter made the sale contingent upon approval by the buyer's board of directors.  HBOC recognized revenue from the sale in the amount of $977,034 in the quarter ended June 30, 1998.

f.      HBOC sold product to Wellpath Community Health Plans on a contract dated June 30, 1998, subject to a side letter dated June 30, 1998.  The side letter made the sale contingent upon approval by the buyer's board of directors.  Wellpath later cancelled the deal. HBOC recognized revenue from the sale in the amount of $870,000 in the quarter ended June 30, 1998.

g.      HBOC sold product to Intracoastal Health Systems, Inc. on a contract dated June 30, 1998, subject to a side letter dated June 30, 1998.  The side letter made the sale contingent upon review by the buyer's counsel and approval by the buyer's board of directors.

HBOC recognized revenue from the sale in the amount of $602,000 in the quarter ended June 30, 1998.

h.      HBOC sold product to West Georgia Health System subject to a side letter dated June 30, 1998.  The side letter made the sale contingent upon approval by the buyer's board of directors.  HBOC recognized revenue from the sale in the amount of $446,000 in the quarter ended June 30, 1998.

i.      HBOC sold product to St. Joseph Hospital on a contract still being negotiated on June 30, 1998, subject to a side letter dated June 23, 1998.  The side letter made the sale contingent upon agreement on final negotiations.  HBOC recognized revenue from the sale in the amount of $311,000 in the quarter ended June 30, 1998.

j.      HBOC sold product to Jewish Hospital Healthcare subject to a side letter dated June 29, 1998.  The side letter made the sale contingent upon approval by the buyer's counsel.  HBOC recognized revenue from the sale in the amount of $187,970 in the quarter ended June 30, 1998.

35.      Beginning in June 1998, representatives of McKesson and HBOC discussed a possible merger of the two companies.  During those discussions, McKesson representatives, including its auditors, reviewed HBOC's financial statements for the first and second quarters of 1998.  The discussions ended on or about July 14, 1998, without agreement, leading to a decline in HBOC's stock price.

36.      On June 30, 1998, McCall received a letter of resignation from a Senior Vice President and General Manager in HBOC's sales department.  In the letter, the manager explained that that he was resigning on advice of counsel because the company "may be engaged in certain overly aggressive revenue recognition practices relating to the second quarter," specifically referencing "contingent contracts."  Shortly thereafter, the manager told McCall that members of HBOC's sales staff were encouraged to close deals with side letters, but not to give the side letters to HBOC's accounting department.  McCall took no meaningful action to investigate or prohibit this practice.

37.     On July 13, 1998, HBOC issued a press release in which it announced the company's preliminary operating results for the period ended June 30, 1998.  The announcement stated that the company had software sales revenue of $130.4 million, total revenue of $376.7 million and net income of $75.6 million in the quarter.  It also quoted McCall as highlighting the "company's continued strong financial performance," and stating:  "We see continued demand by healthcare organizations and the payor industry for information technology solutions to automate processes across the broad expanse of healthcare."

38.     On August 3, 1998, HBOC filed with the Commission a report on Form 10-Q for the period ended June 30, 1998.  The financial statements filed in HBOC's Form 10-Q included the overstated revenue and net income of $376.7 million and $75.6 million, respectively.

39.     McCall was aware of the company's July 13, 1998 public announcement and the company's August 3, 1998 quarterly report at the time they were issued.  He knew, or was reckless in not knowing, that the announcement and report were materially false and misleading when issued because the company improperly recorded the revenue and expenses described above.

40.     On August 14, 1998, HBOC filed a registration statement with the Commission on Form S-4 to register stock to be issued in connection with its acquisition of U.S. Servis, Inc., and, on August 21, 1998, filed an amendment to the registration statement on Form S-4/A. McCall signed both statements.  The Forms S-4 and S-4/A incorporated by reference HBOC's 10-Q reports for the quarters ended March 31 and June 30, 1998.  As explained above, when McCall signed these registration statements, he knew, or was reckless in not knowing, that the financial statements in HBOC's quarterly filings for the March 31 and June 30, 1998 quarters and thus the S-4s and S-4/As were materially false and misleading.

41.     On August 24, 1998, HBOC filed a registration statement with the Commission on Form S-4 to register stock to be issued in connection with its acquisition of Imnet Systems, Inc., and, on October 1, 1998, filed an amendment to the registration statement on Form S-4/A. McCall signed both statements.  The Forms S-4 and S-4/A incorporated by reference HBOC's 10-Q reports for the quarters ended March 31 and June 30, 1998.  As explained above, at the time McCall signed these registration statements, he knew or was reckless in not knowing, that the

financial statements in HBOC's quarterly filings for the March 31 and June 30, 1998 quarters and thus the S-4s and S-4/As were materially false and misleading.

**E.** **Misrepresentations Concerning The Quarter Ended September 30, 1998.**

42.     In its Form 10-K filed on July 14, 1999, McKesson HBOC restated the results for the period ended September 30, 1998.  HBOC originally reported revenue of $399.6 million and net income of $83.7 million.  In its restatement, McKesson HBOC reported that revenue for the period had been overstated by $69.1 million, or 20.9 percent, as a result of improper accounting practices.  McKesson HBOC also reported that net income for the period had been overstated by $67.2 million, or 407.3 percent, as a result of improper accounting practices.  Revenue from backdated contracts and contracts with side letter contingencies accounted for $20.5 million for the quarter or a 5.3 percent overstatement of revenue, and a 15.8 percent overstatement of originally reported software revenue of $151 million.

43.     At the close of the third quarter of 1998, McCall caused HBOC to recognize revenue improperly on sales transactions that were subject to unresolved contingencies at that date.  HBOC sales employees, acting in accordance with the scheme devised by McCall, withheld information concerning these contingencies from the company's accounting staff responsible for revenue recognition.  As a result, the company improperly recognized approximately $18 million in revenue for the quarter  from the following transactions:

a.     HBOC sold product to Baptist Healthcare of Kentucky on a contract dated September 30, 1998, subject to a side letter bearing the same date.  The side letter made the sale contingent upon execution of additional documents.  HBOC recognized revenue from the sale in the amount of $10.79 million in the quarter ended September 30, 1998.

b.     HBOC sold product to Baptist Health of Montgomery, Alabama, on five contracts dated September 30, 1998.  At least one of the contracts was executed on October 5, 1998, but backdated to September 30, 1998.  All five contracts were subject to a side letter dated September 30, 1998, which gave the buyer an unconditional right to cancel the contracts through December 31,

1998.  HBOC recognized revenue from these sales in the amount of $3,696,000 in the quarter ended September 30, 1998.

            c.      HBOC sold product to the Sisters of Charity Health Care System on a contract backdated to September 30, 1998, but signed in October 1998.  The contract was subject to a side letter dated October 5, 1998 giving the buyer an unconditional right to cancel the contract on or before December 14, 1998.  HBOC recognized revenue from the sale in the amount of $1.7 million in the quarter ended September 30, 1998.

            d.      HBOC sold product to Memorial Health Alliance on a contract dated September 30, 1998, subject to a side letter dated September 28, 1998, making the sale contingent upon approval by the buyer's management and board of directors on or before December 31, 1998.  On April 1, 1999, this contingency was extended until August 31, 1999.  HBOC recognized revenue from the sale in the amount of $975,000 in the quarter ended September 30, 1998.

            e.      HBOC sold product to Springhill Memorial Hospital on a contract dated September 30, 1998, subject to a side letter of the same date making the sale contingent upon approval by the buyer's management and board of directors.  Subsequently, this contingency was extended until June 30, 1999.  HBOC recognized revenue from the sale in the amount of $897,000 in the quarter ended September 30, 1998.

            44.      HBOC entered into a transaction with Computer Associates, Inc. dated September 28, 1998.  Under the terms of the contract, Computer Associates agreed to distribute HBOC software products and services and paid $30 million to license HBOC software.  In a separate writing dated September 29, 1998, HBOC undertook a reciprocal obligation to purchase $73.8 million in Computer Associates software for resale.  The contracts were dependent on each other.  Neither company would have made its purchase absent the other's obligation.  Contrary to GAAP, HBOC recognized $30 million of revenue to HBOC from the transaction in the quarter ended September 30, 1998.

            45.      On October 13, 1998, HBOC publicly announced in writing the company's preliminary operating results for the period ended September 30, 1998.  The announcement stated that the company had software sales revenue of $151 million, total revenue of $400 million, total

operating expenses of $266.5 million, and net income of $83.7 million in the quarter.  According to the announcement, McCall highlighted the acquisitions the company negotiated in that quarter as enhancing HBOC's business.

46.     On October 22, 1998, McCall signed a representation letter to HBOC's auditors, stating, with respect to "various registration statements," that "[s]ince December 1997, there have been no events or transactions that have a material effect on the financial statements [of HBOC] that should be disclosed in order to make those financial statements not misleading."  When he signed this letter, McCall knew, or was reckless in not knowing, that this representation was materially false and misleading because of the improper accounting described above.

47.     On October 28, 1998, HBOC filed a report with the Commission on Form 10-Q for the period ended September 30, 1998.  In the financial statements included in HBOC's Form 10-Q, the company reported total revenue of $399.6 million, total expenses of $266.5 million and net income of $83.7 million for the period.

48.     McCall was aware of the company's October 13, 1998 public announcement and its October 28, 1998 quarterly report at the time they were issued.  He knew, or was reckless in not knowing, that the announcement and report were materially false and misleading at the time they were issued.  The total revenue amounts stated in the announcement and quarterly report included the improperly recognized sales identified above.

49.     In the period between October 13 and December 31, 1998, HBOC and McKesson negotiated and reached agreement on an acquisition of HBOC by McKesson effective January 12, 1999.  On November 13, 1998, McKesson took steps to complete the acquisition by filing with the Commission a registration statement on Form S-4 to register common stock to be issued to HBOC shareholders.  On November 27, 1998, McKesson filed additional Forms S-4 and S-4/A.  The Forms S-4 and S-4/A incorporated by reference, and with HBOC's consent, HBOC's false and misleading 10-Q reports for the quarters ended March 31, June 30, and September 30, 1998.

50.     On November 5, 1998, McCall signed a representation letter to HBOC's auditors, who were performing work preliminary to the filing of the Form S-4, stating that "there have been no events or transactions that have a material effect on the [1998 quarterly] financial

statements [of HBOC] that should be disclosed in order to make those financial statements not misleading." When he signed this letter, McCall knew, or was reckless in not knowing, that this representation was materially false and misleading because of the improper accounting described above.

51.     Shortly after the close of the third quarter, HBOC's auditor advised McCall that HBOC's revenue recognition policies were too aggressive and that the company needed to be less aggressive in the future. The auditor specifically referenced the side letter contingencies and said that the auditor had been too lenient in allowing HBOC to recognize revenue on contracts that closed with side letter contingencies providing additional time after the end of the quarter to obtain expected approvals. McCall did not take meaningful steps to investigate or prohibit the practice.

52.     McCall knew, or was reckless in not knowing, that HBOC's 10-Q reports for the three quarters of 1998 were false and materially misleading for the reasons described above. McCall took no action to withdraw or correct the reports or to alert McKesson to the false and materially misleading information in them.

F.     **Misrepresentations Concerning HBOC's Sales In The Period Ended December 31, 1998.**

53.     In its Form 10-K filed on July 14, 1999, McKesson HBOC restated the results for the period ended December 31, 1998. McKesson HBOC originally announced in a press release on January 25, 1999, that its HBOC division had revenue of $468.8 million and net income of $59.6 million in the quarter ended December 31, 1998. In its restatement, McKesson HBOC reported that revenue for the period had been overstated by $88 million, or 23.9 percent, due to improper accounting practices. McKesson also reported that net income for the period had been overstated by $51.1 million, or 601.2 percent, as a result of improper accounting practices. Revenue from backdated contracts and contracts with side letter contingencies accounted for $51.6 million for the quarter or a 12.4 percent overstatement of revenue, and a 52.4 percent overstatement of originally announced software revenue of $150.08 million.

54.     In the fourth quarter of 1998, McCall caused HBOC to recognize revenue improperly on the following product sales transactions that were subject to unresolved contingencies

at that date.  HBOC sales employees, acting in accordance with the scheme devised by McCall, withheld information concerning these contingencies from the company's accounting staff responsible for revenue recognition.  As a result, the company improperly recognized approximately $8.99 million in revenue for the quarter from the following transactions:

a.   HBOC sold product to WebMD on a contract executed on or about January 7, 1999, but backdated to December 31, 1998.  HBOC recognized revenue from the sale in the amount of $5 million in the quarter ended December 31, 1998.

b.   HBOC sold product to UPMC Health Systems on a contract executed on or about January 5, 1999, but backdated to December 31, 1998.  The contract was also subject to a side letter that gave the buyer a right to cancel the purchase.  The buyer's right to cancel was extended in four additional side letters until April 28, 1999, and on that day UPMC cancelled the contract.  HBOC recognized revenue from the sale in the amount of $2.4 million in the quarter ended December 31, 1998.

c.   HBOC sold product to St. Barnabas Hospital in New York on a contract dated December 31, 1998, subject to a side letter of the same date.   The final version of the side letter made the sale contingent upon approval by the buyer's legal counsel on or before March 31, 1999.  HBOC recognized revenue from the sale in the amount of $1.59 million in the quarter ended December 31, 1998.

55.   In November 1998, Gilbertson resigned his position as HBOC's co-president and chief financial officer.  David Held was then promoted to the position of chief financial officer.  In late November 1998, Held told Bergonzi in McCall's presence that he had discovered that HBOC sales employees were improperly using side letters to record contingencies on sales contracts and not reporting those contingencies to the accounting staff responsible for revenue recognition.  McCall did not take meaningful steps to investigate or prohibit the practice.

56.   In early January 1999, Held again reported to McCall and Bergonzi that HBOC sales employees were continuing to use side letters to record contract contingencies and that HBOC had improperly recorded revenue on several contingent contracts.  McCall, Bergonzi and

Held discussed whether they should alert McKesson to these improper accounting entries, but did not do so.  McCall again did not take meaningful steps to investigate or prohibit the practice.

57.   HBOC did not file either an annual or quarterly report for the period ending December 31, 1998 because of its acquisition by McKesson.  Instead, on January 25, 1999, McKesson HBOC issued a press release announcing McKesson's and HBOC's combined results for the period ended December 31, 1998.  The release included financial results from the operations of HBOC, renamed the "Healthcare Information Technology Division" of McKesson HBOC.  The company announced that this division had revenue totaling $468.8 million and an operating profit of $104.2 million for the last quarter.  The release quoted McCall as stating that HBOC's "[r]evenue growth for the year is above target, up 25 percent year to date."

58.   Also on January 25, 1999, McCall participated in a conference call with Wall Street stock market analysts in which he stated:  "We felt we had very, very strong revenue growth for the year.  We exceeded our target at 25% revenue growth last year and during the quarter, I think we had a great deal of success and continue to build our strong base of recurring revenue and outsourcing revenue . . . ."

59.   McCall knew, or was reckless in not knowing, that McKesson HBOC's January 25, 1999, announcement of financial results for the period ended December 31, 1998, was materially false and misleading at the time the results were disseminated to the public.  At the time he made his statements to analysts on January 25, 1999, McCall also knew, or was reckless in not knowing, that his statements were materially false and misleading.

G.   **Misrepresentations Concerning McKesson HBOC's Quarter Ended March 31, 1999.**

60.   In an April 22, 1999 press release, McKesson HBOC preliminarily announced its results for the quarter ended March 31, 1999 and for its fiscal year, which also ended March 31, 1999.  In that release, McKesson HBOC announced that its HBOC division had revenue of $431.9 million for the quarter.  On April 28, 1999, McKesson HBOC announced that it had determined that certain software sales transactions had been improperly recorded.  Subsequently, on July 14, 1999, McKesson HBOC filed a report with the Commission on Form 10-K for the fiscal year ended March

1   31, 1999.  The Form 10-K reported software sales of $402.6 million for the quarter, differing from

2   the previously announced amount by $29.30 million, or 7.3 percent.

3           61.     McCall caused McKesson HBOC to recognize revenue improperly for the

4   quarter and fiscal year ended March 31, 1999.  On March 12, 1999, McCall and McKesson HBOC's

5   then President and Chief Executive Officer participated in a conference call with Wall Street

6   analysts.  During the call, they affirmed that McKesson HBOC would meet expectations for the

7   quarter ended March 31, 1999, including revenue growth of 20 percent in the software segment.

8   McCall soon learned that the revenue projection was in jeopardy.  An anticipated $25 million deal

9   collapsed late in the evening on March 31, 1999 -- the last day of the quarter -- leaving revenue for

10  the quarter from the HBOC division approximately $20 million short of its projected revenue goal for

11  software sales.

12          62.     Beginning on April 1, 1999, in an effort to deceive the company's shareholders

13  and the public, Bergonzi and other employees of the HBOC division commenced negotiation of a

14  transaction with Data General Corporation that would make up the shortfall by recognizing revenue

15  in the quarter that had just ended.  As a result of those negotiations, McKesson HBOC entered into a

16  contract with Data General for an exchange of product and services.  The written contract was

17  separated into two documents.  The first document appeared to be a reseller license and distribution

18  agreement, in which Data General purchased a license for McKesson HBOC software that Data

19  General would resell to other customers.  The purchase price to be paid by Data General was $20

20  million.  Although executed in its entirety on April 5, 1999, the reseller license and distribution

21  agreement was backdated to March 31, 1999.  The second document was dated April 5, 1999 and

22  written as an amendment an existing reseller agreement between HBOC and Data General.  The

23  amendment provided for purchase by McKesson HBOC of hardware from Data General that

24  McKesson HBOC would resell to other customers.  The purchase price to be paid by McKesson

25  HBOC was $25 million.  This "amendment" also provided that McKesson HBOC would assist Data

26  General in reselling the software that Data General had purchased from McKesson HBOC and gave

27  Data General an unconditional right to return any software it was unable to resell by September 30,

28  1999.  A false delivery receipt was created showing that McKesson HBOC had delivered software to

1  Data General on March 31, 1999, but McKesson HBOC actually delivered the software to Data

2  General in April 1999.

3        63.  McCall learned about the Data General transaction from Bergonzi on April 1

4  or 2, 1999.  At that time, McCall agreed to Bergonzi's request that he call the head of Data General to

5  obtain his commitment to do the deal.  Data General's head told McCall he would not do the

6  transaction unless HBOC agreed to a right of return by which Data General could return the HBOC

7  software if it could not sell it.  On April 4, 2002, McCall learned from Bergonzi that the Data General

8  transaction had been completed.

9        64.  McKesson HBOC recognized revenue on the Data General sale in the amount

10  of $20 million in the quarter ended March 31, 1999.  Recognition of this revenue was inconsistent

11  with GAAP because the contract was backdated and included an "inventory for inventory" exchange

12  feature and an unconditional right of return.  At that time, McCall knew that the Data General

13  transaction was backdated and included an unconditional right of return.  McCall therefore knew, or

14  was reckless in not knowing, that revenue from the transaction was improperly included in

15  McKesson HBOC's revenue for the quarter and fiscal year ended March 31, 1999.

16        65.  On April 19, 1999, McKesson HBOC's Chief Executive Officer gave an

17  interview to the Dow Jones news service in which he released preliminary financial results for the

18  quarter and the fiscal year ended March 31, 1999.  According to the Chief Executive Officer,

19  McKesson HBOC had exceeded analysts' consensus estimates of 60 cents per share for McKesson

20  HBOC's fourth fiscal quarter.  He also was quoted as stating that software sales growth in the HBOC

21  unit had exceeded 20 percent for the quarter.

22        66.  On the evening of April 21, 1999, McCall and senior McKesson HBOC

23  executives finalized the company's earnings press release for the quarter ended March 31, 1999, so

24  that it could be issued the next day.  At this time, McCall knew that McKesson HBOC's auditor had

25  learned about the transaction earlier that day and had expressed reservations about recognizing

26  revenue from the transaction in the quarter's results because the transaction included a right of return

27  and because of the inventory swap nature of the transaction.  McCall also knew that the auditor did

28  not know that the agreement had been backdated and that if the auditor had been aware of that fact, it

1 would not have allowed the company to recognize revenue on the Data General transaction in the

2 quarter ended March 31, 1999.

3        67.   On April 22, 1999, McKesson HBOC issued a written press release reporting

4 preliminary financial results to the public for the quarter and year ended March 31, 1999.  The press

5 release stated quarterly revenue of $6.4 billion, including software revenue of $121.2 million.  The

6 press release highlighted a software sales growth increase of 21 percent in McKesson HBOC's fourth

7 fiscal quarter.  The company also reported net income of $177.1 million and earnings per share of 62

8 cents for the quarter.  The press release touted the fact that the reported earnings per share figure of

9 62 cents "exceeded the financial community's consensus earnings per share estimates by two cents."

10 All of these amounts included the revenue from the Data General transaction that accounted for $20

11 million, or 16.5 percent, of the total software revenue reported in the press release for McKesson

12 HBOC.

13        68.   Also on April 22, 1999, McCall and senior McKesson HBOC executives

14 participated in a conference call with Wall Street analysts regarding McKesson HBOC's earnings

15 figures for the quarter.  They reiterated the information contained in the press release including the

16 revenue from the Data General transaction.  McCall stated that the company had 21 percent earnings

17 growth for both the information technology software and service businesses and that operating profit

18 for the healthcare information technology segment increased 38 percent to $141.8 million.

19        69.   Without the fraudulent Data General transaction, McKesson HBOC would not

20 have met the analysts' consensus earnings per share expectation.  Moreover, absent the Data General

21 deal, McKesson HBOC's software sales growth would have been only approximately 1 percent, as

22 opposed to the reported 21 percent.

23        70.   McCall knew, or was reckless in not knowing, that McKesson HBOC's press

24 release announcing financial results for the quarter and fiscal year ending March 31, 1999 was false

25 and materially misleading when issued for the reasons described above.

26

27

28

**H.**     **McCall Was Unjustly Enriched By His Fraudulent Conduct.**

71.     During the period from January 1, 1998 through at least April 22, 1999, defendant McCall was unjustly enriched by his fraudulent conduct at HBOC and later at McKesson HBOC.  Among other things, McCall received substantial compensation, including stock options.

## FIRST CLAIM FOR RELIEF

*Violations of Section 17(a) of the Securities Act*

72.     The Commission realleges and incorporates by reference Paragraphs 1 through 71 above.

73.     During the relevant period, defendant McCall, directly or indirectly, in the offer or sale of securities, by the use of the means or instruments of interstate commerce, or of the mails:

  (a)     with scienter, employed devices, schemes, or artifices to defraud;

  (b)     obtained money or property by means of untrue statements of material fact or omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

  (c)     engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities.

74.     McCall has violated and, unless restrained and enjoined, will continue to violate Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## SECOND CLAIM FOR RELIEF

*Violations of Section 10(b) of the Exchange Act*
*and Rule 10b-5 Thereunder*

75.     The Commission realleges and incorporates by reference Paragraphs 1 through 71 above.

76.     During the relevant period, defendant McCall, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or of the mails, with scienter:

1          (a)      employed devices, schemes, or artifices to defraud;

2          (b)      made untrue statements of material facts or omitted to state material facts

3                   necessary in order to make the statements made, in the light of the

4                   circumstances under which they were made, not misleading; and

5          (c)      engaged in acts, practices, or courses of business which operated or would

6                   operate as a fraud or deceit upon other persons, including purchasers and

7                   sellers of securities.

8          77.      McCall has violated and, unless restrained and enjoined, will continue to

9    violate Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R.

10   § 240.10b-5.

11                           **THIRD CLAIM FOR RELIEF**

12        *Violations of Section 13(b)(5) of the Exchange Act and Rule 13b2-1 Thereunder*

13         78.      The Commission realleges and incorporates by reference Paragraphs 1 through

14   71 above.

15         79.      By engaging in the conduct described above, defendant McCall knowingly

16   circumvented the system of internal accounting controls of HBOC and McKesson HBOC and caused

17   those companies to falsify their accounting books, records and accounts.

18         80.      McCall has violated and, unless restrained and enjoined, will continue to

19   violate Section 13(b)(5) of the Exchange Act, 15 U.S.C. 78m(b)(5), and Rule 13b2-1, 17 C.F.R.

20   § 240.13b2-1.

21                           **FOURTH CLAIM FOR RELIEF**

22                           *Violation of Rule 13b2-2*

23         81.      The Commission realleges and incorporates by reference Paragraphs 1 through

24   71 above.

25         82. By engaging in the conduct described above, and in connection with an audit or

26   examination of the financial statements of HBOC and McKesson HBOC and the preparation and

27   filing of statements and reports with the Commission, defendant McCall, directly or indirectly, made

28   or caused to be made materially false or misleading statements to accountants and omitted to state, or

caused another person to omit to state to accountants material facts necessary in order to make statements made to the accountants, in light of the circumstances under which such statements were made, not misleading.

83. McCall has violated and, unless restrained and enjoined, will continue to violate Rule 13b2-2, 17 C.F.R. § 240.13b2-2.

## FIFTH CLAIM FOR RELIEF

*Section 20(a) Liability for HBOC's and McKesson HBOC's Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder*

84. The Commission realleges and incorporates by reference Paragraphs 1 through 71 above.

85. Between approximately January 1, 1998 and January 12, 1999, defendant McCall was, directly or indirectly, a control person of HBOC for purposes of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

86. Between approximately January 12, 1999 and June 21, 1999, defendant McCall was, directly or indirectly, a control person of McKesson HBOC for purposes of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

87. Between approximately January 1, 1998 and January 12, 1999, HBOC violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, as alleged above.

88. Between approximately January 12, 1998 and April 27, 1999, McKesson HBOC violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, as alleged above.

89. As a control person of HBOC between approximately January 1, 1998 and January 12, 1999, and of McKesson HBOC from approximately January 12, 1999 to June 21, 1999, defendant McCall is jointly and severally liable with and to the same extent as HBOC and McKesson HBOC for HBOC's and McKesson HBOC's violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder during this time period, as alleged above.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

I.

Permanently enjoin defendant McCall from violating Section 17(a) of the Securities Act, Sections 10(b) and 13(b)(5) of the Exchange Act and Rules 10b-5 and 13b2-1 and 13b2-2.

II.

Permanently enjoin defendant McCall from serving as an officer or director of any entity having a class of securities registered with the Commission pursuant to Section 12 of the Exchange Act [15 U.S.C. §78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. §78o(d)].

III.

Order defendant McCall to disgorge any wrongfully obtained benefits, including prejudgment interest.

IV.

Order defendant McCall to pay civil penalties.

V.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

VI.

Grant such other and further relief as this Court may determine to be just and necessary.


Dated: June 4, 2003                          Respectfully submitted,


                                             _____
                                             Judith L. Anderson
                                             Attorney for Plaintiff
                                             SECURITIES AND EXCHANGE COMMISSION

# APPENDIX 1

## RESTATED HBOC RESULTS BY QUARTER

| Quarter Ended | REVENUE (millions) | | | NET INCOME (millions) | | |
|---|---|---|---|---|---|---|
| | Originally Reported[1] | As Restated[2] | % Overstated | Originally Reported[1] | As Restated[2] | % Overstated |
| 3/31/98 | $393.1 | $376.8 | + 4.3% | $64.9[3] | $45.6[3] | + 42.3% |
| 6/30/98 | $382.8 | $376.5 | + 1.7% | $75.6 | $26.4 | +186.4% |
| 9/30/98 | $406.1 | $392.8 | + 3.4% | $83.7 | $16.9 | +395.3% |
| 12/31/98 | $475.8 | $387.8 | +22.7% | $59.6 | $ 8.5 | +601.2% |
| 3/31/99 | $431.9 | $402.6 | + 7.3% | | | |

---

[1] As reported in McKesson HBOC's Form 10-K filing for the year ended 3/31/99. The amounts reported in HBOC's press releases and Form 10-Q and Form 10-K filings are different.

[2] As reported in McKesson HBOC's Form 10-K filing for the year ended 3/31/99.

[3] These numbers include the effect of subsequent period pooling acquisitions by HBOC. Revenue and net income without the subsequent pooling transactions were not available. In its 3/31/98 Form 10-Q, HBOC originally reported revenue of $342.8 million and net income of $64.9 million, respectively. Restated net income was arrived at taking reported revised operating profit net of the reported effective tax rate.